## In re JOINT EASTERN AND SOUTHERN DISTRICTS ASBESTOS LITIGATION.

### No. NYAL–PH–8888.

United States District Court,
E. and S.D. New York.

July 28, 1992.

On April 1, 1991, this Court commenced a consolidated trial of 48 cases seeking compensation for injury or death from exposure to asbestos. The trial was bifurcated. A damages award was returned in the *McPadden* case on August 15, 1991, for the following amounts:

| | |
|---|---|
| Funeral expenses | $ 4,500.00 |
| Past lost income | $ 565,981.85 |
| Past lost services | $ 8,500.00 |
| Non-economic loss | $4,500,000.00 |
| Past pecuniary losses to survivors | $ 17,500.00 |
| Future pecuniary losses to survivors | $ 294,000.00 |
| Past economic loss of consortium | $ 127,300.00 |
| Past non-economic loss of consortium | $ 400,000.00 |

The jury also found the following damages in the *Lewis* case:

| | |
|---|---|
| Past medical expenses | $ 27,795.30 |
| Funeral expenses | $ 2,000.00 |
| Past lost services | $ 8,000.00 |
| Pain and suffering | $1,250,000.00 |
| Past pecuniary losses to survivors | $ 30,000.00 |
| Past non-economic loss of consortium | $ 365,000.00 |

The liability phase began on September 11, 1991. During the latter part of the liability phase most of the trial cases settled. These settlements substantially reduced the size of the trial.

The jury returned the liability verdict on March 13, 1992. It found Crane's equitable share of McPadden's injuries to be 10%. No finding allowing an exception under Article 16 of the CPLR was made. The jury also found Keene's equitable share of Lewis' injuries to be 9%. In both cases the jury declined to award punitive damages.

Many of the claims now raised by the defendants are similar. Both Crane and Keene move for judgment notwithstanding the verdict (more properly termed a motion judgment as a matter of law) on the ground that the evidence failed to show proximate cause between their products and the injuries or liability. Both defendants complain about the size of the verdicts. They contend that the sums awarded by the jury must be remitted.

---

## MEMORANDUM AND ORDER

SIFTON, District Judge.

John Crane–Houdaille Inc. and Keene Corporation move for judgment notwithstanding the verdict, a new trial, or other post-verdict relief. For the reasons discussed below, the motions are denied.

Some issues are raised only by Crane. Thus, Crane requests a new trial on all issues because the jury was likely to be confused by the complexity of the trial and because of certain evidentiary rulings. Crane also requests this Court to hold a factual hearing to determine if the complaint should be dismissed for plaintiff's failure to abide by an alleged oral settlement agreement.

Keene also advances its own issues. It argues that the weight of the evidence does not support the jury's apportionment of 9% liability to Keene. It also contends that the Court has effectively imposed market share liability.

## DISCUSSION

### Judgment as a Matter of Law

■ The Court will grant a motion for judgment notwithstanding the verdict, now more properly denominated a renewal of a motion for judgment as a matter of law, Fed.R.Civ.P. 50 (as amended effective Dec. 1, 1991), where, under governing substantive law, only one reasonable conclusion can be reached from the evidence. *Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

■ While all inferences and questions of credibility are considered in the light most favorable to the non-movant, *Fane v. Zimmer*, 927 F.2d 124, 128 (2d Cir.1991); *Powell v. Gardner*, 891 F.2d 1039, 1043 (2d Cir.1989), a mere metaphysical doubt or scintilla of evidence is not sufficient to preserve the non-movant's judgment. *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512; *Fane*, 927 F.2d at 128. Instead, the court looks at the totality of the evidence presented. *Wm. Passalacqua Builders v. Resnick Developers*, 933 F.2d 131, 140 (2d Cir.1991).

■ Granting such a motion is, therefore, proper if either—
(1) there is a complete absence of probative evidence to support a verdict for the non-movant or (2) the evidence is so strongly and overwhelmingly in favor of the movant that reasonable men in the exercise of impartial judgment could not arrive at a verdict against him.
*Powell*, 891 F.2d at 1043 (citations omitted).

■ In this circuit, following and interpreting New York law, the rule is that circumstantial evidence may be used to prove any of the adjudicative facts. *O'Brien v. National Gypsum Co.*, 944 F.2d 69, 72 (2d Cir.1991).

■ Asbestos cases are treated no differently than any others. *Id.* *O'Brien*, *id.*, and *Johnson v. Celotex Corp.*, 899 F.2d 1281 (2d Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 297, 112 L.Ed.2d 250 (1990), are correctly viewed as showing a general policy towards sufficiency of evidence, not as narrow rulings limited to their specific facts.

■ Both defendants argue that the plaintiffs did not present sufficient proof of proximate cause. The standard for proximate cause in a case such as this is easily stated. New York law requires the plaintiff to prove "that he was exposed to [defendant's] merchandise and that it is more likely than not that this exposure was a substantial factor in his injury." *Johnson*, 899 F.2d at 1285–86. Under this basic rule a jury verdict of sufficient exposure is supportable if plaintiff is "placed ... in the vicinity of an area where asbestos products were used on a regular basis" during the relevant time period. *Weitzman v. Eagle Picher Industries*, 144 Misc.2d 42, 542 N.Y.S.2d 118, 122 (Sup.Ct.N.Y.Cty.1989) (J. Freedman). The Second Circuit recently reaffirmed this standard and explicitly restated that direct proof of product identification is unnecessary, especially in death cases. *In re Brooklyn Navy Yard*, 971 F.2d 831, 836–37, No. 91–9325(L), slip op. at 4–6 (2d Cir. June 30, 1992).

Defendants urge the Court to narrow this standard by adopting the "frequency-regularity-proximity" test articulated in *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156 (4th Cir.1986). Neither New York nor the Second Circuit reviewing New York law has adopted this test. *See Slaughter v. Southern Talc Co.*, 949 F.2d 167, 171 n. 3 (5th Cir.1991).

A straightforward application of the New York rule disposes of Keene's causation argument. Considering all the evidence and drawing all reasonable inferences from it in the light most favorable to the non-movant, *Fane*, 927 F.2d at 128, the record supports the jury's finding of proximate cause in the *Lewis* case.

Jeno Manna placed Lewis, a sheetmetal worker, at the Hoffman–LaRoche facility in Nutley, New Jersey, in the late 1950's or early 1960's. The testimony of Listes, an insulation supervisor, demonstrates that the contractor Matthew Balich used asbestos manufactured by Baldwin–Ehret–Hill, Keene's successor in interest, during several periods over a long period of time, including the early 1960's, for boiler breechings at the Nutley facility. Tr. Dec. 2 at 7233–40, 7244–47, 7260–69. The Hertel testimony demonstrated that sheetmetal workers worked on boiler breechings. Tr. Oct. 18 at 3709–10.

Additional evidence of exposure also exists. Manna placed Lewis at the Astoria powerhouse in the late 1950's or mid 1960's. Tr. Nov. 13 at 5654–55. Kolman testified to the use of BEH block at Astoria in the '50's and '60's. Tr. Nov. 15 at 5958–59, 5972–73. Finally, Manna placed Lewis at the Time–Life building during its period of construction in the late 1950's. Tr. Nov. 13 at 5634–36. Herzich's testimony can reasonably be read to place products for which Keene is responsible at that site. Tr. Sept. 20 at 1036, 1043–50.

Defendant's argument that proximate cause does not exist where "there are several possible causes of an injury," *Schwartz v. Macrose Lumber & Trim Co.,* 29 A.D.2d 781, 287 N.Y.S.2d 706, 707–08 (2d Dept.1968), *aff'd,* 24 N.Y.2d 856, 301 N.Y.S.2d 91, 248 N.E.2d 920 (1969), dates from the era prior to New York's adoption of comparative negligence. *See* N.Y. CPLR § 1411. Under that standard the fact that an injury has more than one cause does not bar liability as to any one of the multiple causes.

Defendant's citation to cases holding that, when "the precise cause of the accident is left to conjecture" no liability exists, *Smith v. Squire Homes, Inc.,* 38 A.D.2d 879, 329 N.Y.S.2d 243, 245 (4th Dept.1972), is equally inapposite. The fact that the evidence set forth above is circumstantial does not render the jury's conclusion conjectural. *See O'Brien,* 944 F.2d at 72.

Defendant, without explaining why, argues that *O'Brien* should be confined to instances of "signature" diseases such as mesothelioma. Here, however, the precise medical "cause" of Lewis' lung cancer—exposure to asbestos dust—is not seriously in dispute. No evidence was presented to challenge the conclusion rendered by plaintiff's expert or to suggest any other cause of Lewis' disease. The evidence indicates that Lewis, as a sheetmetal worker, participated in boiler construction operations that exposed him to defendant's asbestos. As in *O'Brien,* the mere fact that this one defendant only produced some of the asbestos to which Lewis was likely exposed does not relieve this defendant of responsibility.

Crane's argument differs slightly. That company contends that plaintiff failed to prove that the form of asbestos manufactured by it caused plaintiff's injury. Specifically, Crane complains that no expert testimony demonstrated that Crane's type of products released significant quantities of respirable fibers.

Crane's experts testified on the "friability" of Crane's products. Crane's motion defines "friable" from the testimony of its witness, Mr. Buccigross, as "reduci[ble] to powder by hand pressure." Motion 22, referring to Trial Transcript 10550.

Numerous witnesses who worked with Crane's type of product testified to the release of large quantities of dust under actual working conditions. Furthermore, plaintiff submitted tests conducted by the Navy which reach different results than Crane's tests. Crane's tests were attacked on cross-examination as conducted in conditions relevantly different from actual working conditions. The jury had the right to choose to believe the plaintiff's characterization of the evidence on this point.

Both defendants also challenge the sufficiency of the evidence demonstrating that they knew or should have known that the products they manufactured were dangerous as used by McPadden and Lewis.

■■■■■ Under now familiar principles of New York law, a manufacturer has a duty to warn of dangers about which it knew or should have known. *Andrulonis v. United States*, 924 F.2d 1210, 1220 (2d Cir.), *vacated on other grounds*, — U.S. ——, 112 S.Ct. 39, 116 L.Ed.2d 18 (1991); *Lindsay v. Ortho Pharmaceutical Corp.*, 637 F.2d 87, 91 (2d Cir.1980). In determining whether a manufacturer knew or should have known about a danger, it is—

> held to the knowledge of an expert in its field, ... and therefore has a duty 'to keep abreast of scientific knowledge, discoveries, and advances and is presumed to know what is imparted thereby.' ... In addition, a manufacturer has a duty to test fully and inspect its products to uncover all dangers that are scientifically discoverable.... In fulfilling its duty, a manufacturer may not rest content with industry practice, for the industry may be lagging behind in its knowledge about a product, or in what, with the exercise of reasonable care, is knowable about a product.

*George v. Celotex*, 914 F.2d 26, 28 (2d Cir.1990).

■■■ Crane attacks the sufficiency of the evidence that it knew or should have known of a danger in its products which triggered a duty to warn. Here again, Crane's argument is reducible to a request that the jury and this Court only consider direct evidence about Crane's exact product. No such limitation exists in New York law. Crane has supplied no authority which supports such a reading of the applicable law. Crane cannot escape the fact that it was a manufacturer of an asbestos-containing product, which suffices to hold it to the knowledge of an expert in the asbestos manufacturing field.

■■■ Keene makes a slightly more general argument. It contends that, at the time of Lewis' exposure, the state of scientific knowledge tolerated exposures below the threshold limit value of 5 million particles per cubic foot of air and that Keene's product stayed within this limit. In support of this claim defendant points to the 1938 Dreesen study, the 1946 Fleischer and Drinker study, and the opinion of the American Conference of Governmental Industrial Hygienists from approximately 1950 to 1969.

The plaintiffs, however, supplied ample evidence that various persons and groups during the relevant time period had knowledge of danger to workers from asbestos at levels of exposure below 5 million particles per cubic foot of air. Among other evidence, plaintiffs introduced the Hemeon Report, which called the safety of the TLV into question. In *George*, the Second Circuit rejected a challenge, brought by the law firm now representing Keene, contending that the Hemeon Report was irrelevant to the state of the art. *George*, 914 F.2d at 29. When faced with this and other relevant evidence, the jury had ample basis to conclude that Keene should have known of the dangers inherent in its product and, thus, should have warned.

■■■ Keene also argues that the jury's apportionment of 9% liability lacks an evidentiary basis. Keene points to the fact that the plaintiff's evidence established exposure to other company's products and that products manufactured by other companies "were identified with greater frequency by the other plaintiffs and the product identification witnesses."

■■■ The jury must, of course, apportion liability based on the facts presented to it in this case. As already discussed, sufficient evidence exists to support the conclusion that Keene was liable for some portion of Lewis' injury. Beyond that, Keene was free to argue to the jury that its share should have been very low, and to present evidence in support of that argument. Keene, however, elected not to do so. In fact, Keene's attorney in summation could not have more clearly disavowed such a strategy:

> I am here today on behalf of Keene Corporation not as some of the other

parties in this case like Owens–Illinois and Owens–Corning Fiberglass, to point fingers at other companies, not like some of the third parties, like Con Edison, LILCO, pointing the finger at Owens–Corning Fiberglass and Owens–Illinois. I am here to discuss with you the evidence as it relates to Keene Corporation and the evidence of exposure to the products of Baldwin–Ehret–Hill. . . .

I so alleged because I think when we review the evidence this afternoon together, we will find that there was no exposure to the products of Baldwin–Ehret–Hill.

Tr., Feb. 27, 1992, at 11396.

In spite of this strategic choice and the fact that Keene was the only active defendant remaining in the *Lewis* case, the jury still spread responsibility quite broadly in response to the evidence of exposure attributable to other companies. In particular, the jury divided liability among some thirty-four companies, including Keene. It attributed between 4.5 and 9% liability to six companies other than Keene.

Given the factors relevant to the apportionment of liability, the evidence supported this allocation. Evidence allowed the jury to conclude that Lewis had suffered exposure to Keene products at several worksites. Some of those exposures occurred fairly early in Lewis' work life; the medical evidence presented allowed the jury to conclude that early exposures were more significant in causing disease than later exposures.

### ERRORS STEMMING FROM CONSOLIDATION AND TRIAL COMPLEXITY

Both defendants claim that the Court's decision to consolidate 48 cases for trial produced a variety of errors requiring a new trial.

■ Crane argues that the welter of proof and issues, many of which became irrelevant by the time the jury retired, confused the jury. Crane cites two authorities on this point. The first, *George v. Celotex,* 914 F.2d 26 (2d Cir.1990), contains no statement that the complexity of a consolidated asbestos case may require retrial due to possible jury confusion. The only mention in *George* of jury confusion is the marginally relevant statement that Federal Rules of Evidence 403 allows a judge discretion to exclude probative evidence if its value is outweighed by, *inter alia,* jury confusion. *Id.* at 30–31. Crane's second authority is *Cain v. Armstrong World Industries, Inc.,* 785 F.Supp. 1448 (S.D.Ala.1992) Exh. C to Crane's motion. The *Cain* court ordered retrial of part of a consolidated asbestos case based in part on jury confusion. However, its reasons for finding such confusion were the identical damages awarded to cancer and non-cancer cases, the relatively short time the jury deliberated, the size of the damages awards, and the total lack of evidence supporting some of the jury's findings. *Id.* at 1455. These factors do not exist here. The *Cain* court carefully stated that its decision should not be viewed as implying that consolidation is inappropriate in other asbestos cases. *Id.* This Court agrees.

■ Crane argues that this Court should grant a new trial on all issues because of certain evidentiary rulings with which it disagrees. Crane's first argument is that this Court erroneously allowed the admission of evidence of later remedial behavior in violation of Federal Rule of Evidence 407, i.e., the warning labels Crane began to use in the 1970's. Although Crane made numerous evidentiary objections throughout the trial both orally and in writing mostly on the grounds of relevance of cumulativeness, it never expressed the objection it now urges.

Federal Rule of Evidence 103 states that error may not be predicated on a ruling to admit evidence unless, *inter alia,* a contemporaneous objection is made giving the grounds of the objection. Therefore, Crane can only rely on this alleged error if it constitutes plain error under Federal Rule of Evidence 103(d).

Plain error is of limited application in civil trials. By Second Circuit formulation it exists only "where the error may result in a miscarriage of justice or in obvious

instances of misapplied law." *Care Travel Co. v. Pan American World Airways*, 944 F.2d 983, 995 (2d Cir.1991) (citations omitted) (allegedly erroneous jury instruction). Such an error is one "so serious and flagrant that it goes to the very integrity of the trial." *Modave v. Long Island Jewish Medical Center*, 501 F.2d 1065, 1072 (2d Cir.1974) (citations omitted).

■ Circumstances which mitigate against a finding of plain error include the complexity of the trial, *Kelco Disposal Inc. v. Browning–Ferris Indus. of Vt.*, 845 F.2d 404, 409 (2d Cir.1988), *aff'd*, 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989), and counsels' ample opportunity to object (as shown by the trial court's considering counsels' other objections on the same ruling), *Care Travel*, 944 F.2d at 996. Both of these factors are present here. Furthermore, as Crane admits, when Crane raised this point during McKillop's cross-examination, this Court promptly took remedial action.

■ In all events, Federal Rule of Evidence 407 is not a total prohibition of the use of evidence of later remedial measures. Since Crane did not give its opponents a contemporaneous opportunity to discuss the other reasons for proffering the evidence, it cannot now claim its admission was plain error. The label evidence was a very small part of the showing that Crane totally ignored the possibility of danger from its products at the time of McPadden's exposure. Crane did no product safety testing, did not employ an industrial hygienist, did not have a research library on product safety, and did not join any of the industry groups which shared such items. Despite Crane's formulation, the plaintiff's use of the label evidence focused on the statement that no warning labels were placed on the products at the time of McPadden's exposure, not that the labels were placed on the products later because Crane recognized the danger.

Next, Crane objects to the introduction of evidence on any Crane products except for the specific items mentioned by McPadden as ones he himself used. Crane also objects to the introduction of evidence on tests of gaskets not manufactured by Crane. However, these objections simply ignore Second Circuit rules on circumstantial evidence.

■ Next Crane objects under Federal Rules of Evidence 403 to the admission of evidence of its wealth before any finding that plaintiff was entitled to punitive damages. However, the only evidence Crane mentions on this point is general descriptions of the size of the firm. These items were introduced to show that (1) Crane had the resources to investigate if its products were dangerous and (2) Crane had a financial motive to suppress information on product dangers. The balance under Rule 403 did not favor exclusion of this material, particularly since Crane was not shown to have been a particularly large or wealthy firm.

■ Finally, Crane briefly complains of this Court's ruling declining to identify the person referred to in its missing witness instruction. A trial court has discretion to frame the wording and style of the charge. *Care Travel Co. v. Pan American World Airways*, 944 F.2d 983, 994 (2d Cir.1991). The "court is not obligated to use the exact words proposed by a party." *Id.; accord Pagnella v. Action for a Better Community*, 57 A.D.2d 1076, 395 N.Y.S.2d 834, 835 (4th Dept.1977). This is true even if the proffered instruction is an accurate statement of the law. *Fleming v. Michigan Mut. Liability Co.*, 363 F.2d 186, 189 (5th Cir.1966). "A jury instruction will be deemed adequate [ ] so long as the charge, taken as a whole, is correct and sufficiently covers the case so that a jury can intelligently determine the questions presented to it." *Care*, 944 F.2d at 996 (internal quotations omitted, citations omitted).

"Once a judge has made an accurate and correct charge, the extent of its amplification must rest largely in his discretion." *United States v. Bayer*, 331 U.S. 532, 536, 67 S.Ct. 1394, 1396, 91 L.Ed. 1654, *reh'g denied*, 332 U.S. 785, 68 S.Ct. 29, 92 L.Ed. 368 (1947). This is true even if the charge

is so terse it can be described as "cryptic." *Id.*

█ Keene makes the argument that the dynamics of this consolidated trial involving many defendants effectively imposed market share liability on the defendants. Nothing in the trial of this case supports that conclusion. The jury did not receive market share evidence in the *Lewis* case. The jury did receive evidence linking particular defendants to particular sites at particular times and can be understood to have apportioned liability on that basis. The Court gave no instruction that could even remotely be construed as encouraging the jury to consider market share liability.

The jury had before it ample evidence that asbestos products are not fungible; unlike a compound such as DES, asbestos appears in many different forms in a variety of products. Such a defense was, of course, available to Keene if it believed that some quality unique to its product made it safe. Indeed, Crane pursued precisely this sort of defense.

### Settlement Agreement

█ Crane argues that this Court should hold an evidentiary hearing on the existence of an allegedly breached oral agreement between Crane and plaintiff's counsel to settle this case. Crane also argues that this relief should be granted under a fraudulent inducement theory. According to Crane, plaintiff's counsel, Trevor Pearlman, agreed to settle the *McPadden* case with Crane if Crane did not call its medical expert, Dr. Bluemink. Crane first raised this issue before this Court last September. Settlement agreements between parties during trial are contracts enforceable by the court. *Janus Films, Inc. v. Miller*, 801 F.2d 578, 582 (2d Cir.1986). Such agreements may be oral. *Fustok v. Conticommodity Servs., Inc.*, 577 F.Supp. 852, 859 (S.D.N.Y.1984). However, when factual issues exist as to whether such a settlement was actually reached, the issue cannot be decided without a trial. *Vari–O–Matic Machine Corp. v. New York Sewing Machine Attachment Corp.*, 629 F.Supp. 257, 259 (S.D.N.Y.1986); *Fustok*, 577 F.Supp. at 858–59 (citing *Interocean Ship-*

*ping Co. v. National Shipping & Trading Corp.*, 462 F.2d 673 (2d Cir.1972)).

█ Since plaintiff declined to waive a jury, this Court considered but rejected the propriety of submitting the issue to the jury then considering the liability case. Further research shows that no right to a jury trial exists in a suit merely requesting specific performance. *See, e.g., Ford v. Citizen's & Southern Nat. Bank*, 928 F.2d 1118, 1121–22 (11th Cir.1991); *Adams v. Johns–Manville Corp.*, 876 F.2d 702, 709 (9th Cir.1989); *Matter of Cotton*, 127 B.R. 287, 291 (Bkrtcy.M.D.Ga.1991). The parties are ordered to appear for bench trial of this matter on August 17, 1992, at 9:30 a.m.

This Court will enter the judgment but *sua sponte* stay it pending the outcome of the trial of this issue. The parties are deemed to have made a motion pursuant to Federal Rules of Civil Procedure 6(b) for enlargement of time to appeal from the judgment. The time to appeal will be tolled until this Court decides the merits of the settlement issue.

### Mistrial and Remittitur

Both defendants object to certain facets of the jury's damage awards as excessive in view of the evidence. Both defendants challenge the awards for pain and suffering and for loss of consortium. In *McPadden*, Crane also challenges the award for past lost earnings.

Remittitur or retrial of the damage awards was originally raised in these consolidated cases by Owens–Corning Fiberglas ("OCF") (which has since settled out of these cases) at the end of the damages phase of the trial. Keene did not join the motion at that time. Crane joined that motion with a two-page affidavit dated October 7, 1992, by its attorney Suzanne Halbardier. In that affidavit, Crane relied on the legal arguments submitted by OCF but pointed to the *McPadden* verdict as "clearly the result of sympathy and error."

In its current motion, Crane again relies on OCF's original legal arguments. Two different arguments are advanced: that the verdict was based on sympathy and

that the amounts awarded are shocking and must be remitted.

For its part, Keene does not distinguish between a mistrial or remittitur, although it cites a case, *Koster v. Greenberg*, 120 A.D.2d 644, 502 N.Y.S.2d 395 (2d Dept. 1986), remitting a verdict, which has little other bearing on this case.

■ On a motion for mistrial based on sympathy, the movant must demonstrate that the improper conduct of counsel created "undue prejudice or passion or played upon the sympathy of the jury." *Mathews v. CTI Container Transp. Int'l, Inc.*, 871 F.2d 270, 278 (2d Cir.1989); *see also Pappas v. Middle Earth Condominium Ass'n*, 963 F.2d 534, 540 (2d Cir.1992); *Smith v. Piedmont Airlines, Inc.*, 728 F.Supp. 914, 919 (S.D.N.Y.1989).

> [N]ot all misconduct of counsel taints a verdict to such a degree as to warrant a new trial.... Some misconduct is *de minimis* in the context of the entire trial, and some is properly dealt with by the trial court's rulings and curative instructions.... [T]he trial court has a superior vantage point when evaluating the impact of the allegedly prejudicial conduct.... [T]he trial court's decision] is reviewed under the traditional abuse of discretion standard.

*Pappas*, 963 F.2d at 540.

In that case, the Court of Appeals reversed the trial court after a long discussion of the "unique circumstances" present in the case: the improper remark appealed to regional prejudice (one of the key reasons behind diversity jurisdiction); contemporaneous objection to the improper remark was overruled; no curative instruction was given; a boilerplate jury instruction did not target the impropriety of the remark; and the skimpy evidence offered at trial supported the inference that the jury relied on the impermissible line of reasoning to reach its result. *Id.* at 540.

■ In the present case, the allegedly improper remarks complained of are plaintiff's counsel's suggestions with respect to the amounts of damages to award. The Court of Appeals has refused to adopt a per se rule as to such suggestions. *Mileski v. Long Island R.R. Co.*, 499 F.2d 1169 (2d Cir.1974). Instead, it uses "a more flexible approach which ... leave[s] the matter largely to the trial judge's discretion." *Id.* at 1174; *see also Tate by McMahon v. Colabello*, 58 N.Y.2d 84, 459 N.Y.S.2d 422, 424, 445 N.E.2d 1101, 1103 (1983) (allowing attorney suggestions of specific amounts).

The circumstances surrounding counsel's mention of specific figures demonstrate that no prejudicial error occurred. As suggested by *Mileski*, 499 F.2d at 1174, this Court gave a curative jury instruction which was not simply boilerplate. The Court cautioned the jury several times to base damage awards on evidence. The jury deliberated at length on the damage awards. *Compare Smith v. National R.R. Passenger Corp.*, 856 F.2d 467 (2d Cir.1988) (deliberation for six hours on two days separated by weekend shows jury was not influenced) *with Cain* at 1456 (shortness of jury deliberation supports mistrial on damage amounts). Furthermore, the jury in this case awarded less than requested by plaintiffs' counsel in almost all cases, *compare Uris v. Gurney's Inn Corp.*, 405 F.Supp. 744, 747 (E.D.N.Y.1975) (influence of improper suggestions on amount of award where "jury's specific awards ... closely tracked counsel's suggestions"), and the awards were not similar for dissimilar harms. *Compare Cain* at 1455 (no distinction between awards in cancer and non-cancer cases).

■ Remittitur is proper if, even though the proceedings are not tainted in such a manner as to require a mistrial, the damage award is otherwise excessive.

■ There is some apparent ambiguity in the standard for determining whether remittitur is appropriate. The Second Circuit has stated that a court should remit a verdict that is "so excessive as to shock the judicial conscience." *Mathews*, 871 F.2d at 278 (citation omitted, internal quotations omitted). The state standard appears to differ. This difference was created by the 1986 change in the New York State standard for remittitur.

In reviewing a money judgment in an action in which an itemized verdict is required ... in which it is contended that the award is excessive or inadequate and that a new trial should have been granted unless a stipulation is entered to a different award, the appellate division shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation.

N.Y. CPLR § 5501(c) (as amended by Section 10 of L.1986, c. 682 eff. July 30, 1986 and applicable to any action in which trial has not been commenced as of Aug. 1, 1988, pursuant to section 12 of L.1986, c. 682).

As pointed out in the practice commentary to this change, the legislature only exempted the appellate division from the older "shocks the conscience" standard; presumably, supreme court trial judges and judges of the appellate term are still bound by the older standard. This seems illogical, and presumably as a practical matter the two standards will converge over time. David D. Siegel, *Supplementary Practice Commentary* C5501:10, *reprinted in* McKinney's Consolidated Laws of New York Annotated at 4–5 (1991 Supp.). The New York Court of Appeals appears to take the recitation of the incorrect standard as error, *Harvey v. Mazal American Partners,* 79 N.Y.2d 218, 581 N.Y.S.2d 639, 643, 590 N.E.2d 224, 228 (1992) (remanding case to the appellate division to reconsider remittitur under proper standard), which implies that some difference exists.

For the purpose of a federal court's remittitur decision, however, the two standards work in harmony. It "shocks the conscience" of a federal judge for a federal court sitting in diversity to allow a verdict which would necessarily be remitted as a matter of law by a state court using the appropriate state standard.

 Certain standards guide the Court's inquiry into the appropriateness of jury damage awards. A court may use verdicts reached by other courts, particularly state courts in the relevant jurisdiction, as a point of reference by which to gauge the appropriateness of the award. *Mathews,* 871 F.2d at 278; *see also Raucci v. Town of Rotterdam,* 902 F.2d 1050, 1058 (2d Cir.1990); *Fuentes v. Consolidated Rail Corp.,* 789 F.Supp. 638, 645 (S.D.N.Y. 1992). Cases before the New York State courts, however, do not set "a maximum on the plaintiff's permissible recovery, but only ... provided guidance as to levels of recovery that are realistic rather than fanciful." *Martell v. Boardwalk Enterprises, Inc.,* 748 F.2d 740, 754 (2d Cir.1984) (using state cases as guidepost but exceeding highest state award by almost 30%). Furthermore, each jury must consider the details of the plaintiff's circumstances. *See, e.g.,* 36 N.Y.Jur.2d § 64, at 113 (1984) ("nature and extent of the injuries, the suffering occasioned by them, and the duration or prospective duration thereof").

 Both defendants challenge the jury's awards for pain and suffering. This element of damages amounted to some $4,500,000.00 in the *McPadden* case and $1,250,000.00 in the *Lewis* case.

While numerous courts have reduced pain and suffering awards, a court must look at the specifics of the case at bar before making such a decision. McPadden died as a young man and left behind a wife and child. This circumstance allows the jury to decide that his mental anguish justified a higher than usual award. Lewis left behind a wife who required extensive care. The jury could well have found that worry for his wife's future created a particular sort of anguish that accompanied the physical pain associated with his injury. In the case of both men, the physical pain and suffering associated with their slow deaths by asphyxiation was considerable.

Comparisons of these awards with other asbestos cases, not to mention with other non-asbestos cases, is not as helpful as the general rule suggests. The reason that a court should look to awards in other cases is that "[j]ury verdicts and judicial opinions approving them or disapproving them, when considered over a period of time, provide some indication of the consensus of opinion of jurors and courts as to the proper relation between the character of the

injury and the amount of compensation to be awarded." *Martell,* 748 F.2d at 750 (quoting *Senko v. Fonda,* 53 A.D.2d 638, 384 N.Y.S.2d 849, 851–52 (2d Dept.1976) (internal quotations omitted)). The other asbestos cases relied upon by Crane and OCF are relatively recent; indeed, it is mere fortuity that they were reduced to verdict before this one. The history of verdicts for asbestos-related injuries is much shorter than for the loss of a limb discussed in *Martell.* At this early stage in the history of asbestos litigation, courts permitting lesser damages than the jury found here might easily be criticized for being too low rather than accepted as an indictment of these awards as being too high. Moreover, various New York courts have allowed substantial damages for pain and suffering. Justice Freedman allowed several multimillion dollar awards for pain and suffering in the state court's Brooklyn Navy Yard consolidation. OCF's Memo. of Law at 15 (chart). No reduction or new trial in either case is warranted on the facts presented.

■ Both defendants also challenge the awards for loss of consortium prior to death. The jury awarded $127,300 for economic losses and $400,000 for non-economic losses of this variety in the *McPadden* case. The jury also awarded $365,000 for non-economic loss of consortium in the *Lewis* case.

In support of this challenge, Crane asserts there was no proof of any economic loss because no economist testified in the *McPadden* case. Crane cites no authority for the proposition that economic loss can only be proven by the testimony of an expert. Crane also argues that the award for non-economic loss was clearly excessive since McPadden's illness only lasted eleven months.

■ The injuries compensable as "loss of consortium" under New York law are diverse. The damages must be based on "the real injury done to the marital relationship." *Andrulonis v. United States,* 724 F.Supp. 1421, 1533 (N.D.N.Y. 1989) (quoting *Millington v. Southeastern Elevator Corp.,* 22 N.Y.2d 498, 293 N.Y.S.2d 305, 309, 239 N.E.2d 897, 901 (1968)), *aff'd in part and rev'd in part on other grounds,* 924 F.2d 1210 (2d Cir.), *cert. granted & vacated on other grounds,* — U.S. —, 112 S.Ct. 39, 116 L.Ed.2d 18 (1991). However, this includes pecuniary and non-pecuniary losses. The pecuniary losses include the value of any additional responsibilities the wife had to assume in place of her injured husband, including household chores, yard duties, and child rearing. *Id.*

■ Non-economic compensable harms include love, companionship, affection, society, sexual relations, solace, and the trauma of caring for the invalid. *Id.* In quantifying the non-economic harms, the trier of fact may consider the—

nature and happiness of the marriage prior to the husband's injury, how the marital relationship has changed subsequent to the husband's injury, whether that change is attributable in whole or in part to any material change in the husband's personality, attitudes, and capabilities, the causal relationship between the husband's injury and any change in his personality and capabilities, and the permanence of these changes in the husband.

*Id.* at 1534 (citations omitted).

As to economic harms, Anne McPadden had to assume the sole care of two children, one young. She became solely responsible for the couple's duties as landlords. Martin McPadden was forced to stop renovating their rental units.

The high values which can be placed on this type of harm is shown by the treatment of the wrongful death cause of action in *Gonzalez v. New York City Housing Authority,* 77 N.Y.2d 663, 569 N.Y.S.2d 915, 572 N.E.2d 598 (1991). In *Gonzalez,* the New York Court of Appeals affirmed as not excessive a wrongful death award of $1,250,000 to the two grandchildren of a retired elderly lady. These recipients were adults who did not live with the decedent. Even in wrongful death awards, where New York law limits recovery to items with a market value, the income of the decedent

is not a ceiling on the recovery. *Id.,* 569 N.Y.S.2d at 918, 572 N.E.2d at 601.

As to the non-economic harms, Anne McPadden testified to a close marital relationship which had developed from a childhood friendship. She was forced to watch the unexpected and painful death of her relatively young husband and to support her children emotionally during this trauma. Testimony at trial demonstrated that Esther Lewis depended on her husband for emotional support much more heavily than the average wife, as she suffered from bouts of depression. Tr. May 9, 1991, at 2832–35 (testimony of Howard Lewis).

While the non-asbestos cases cited by Crane (and the one case, although inapposite, cited by Keene) resulted in relatively lower awards, as discussed above, this type of asbestos injury is a recent judicial experience. Prior cases on different injuries cannot be assumed to show the unreasonableness of slightly higher awards.

██ Crane next challenges the award of approximately $566,000 reported by the jury on the verdict form as loss of income prior to death. Crane objects that this award is unsupported because McPadden continued to receive his disability and pension payments until his death. These payments only totalled approximately $20,000 per year. Plaintiff's counsel does not address this issue in his papers opposing this motion. The verdict sheet requested the jury to set an amount of damages for "lost income—past (prior to death)." In the blank space provided, the jury wrote "$565,981.85."

The source of this figure is clear from an examination of the summation for the plaintiff. Tr. July 16, 1991, at 2544–56. The summation made no claim for past lost earnings. Instead, it sought future lost earnings of $565,981.85 based on a life expectancy of 25.7 years and McPadden's actual income at death of $22,022.64 per year (disability pension and social security). *Id.* at 2551. Plaintiff's counsel requested the jury to award the McPadden family this sum as part of the pecuniary award to the survivors. He also stated that the required offset for the expenses which the family would have incurred if Martin McPadden lived should be set off by not awarding anything for the carpentry jobs the decedent would have done if he had lived. In sum, he requested a net award of $565,-981.85 for the subset of "Pecuniary Losses to Survivors: Future (Undiscounted)" which was intended to compensate the McPadden family for the estate's loss of Martin McPadden's earning power due to his early death from mesothelioma.

Clearly, the jury complied with this request, although mistakenly recording its verdict in the space for the "past income" award. Because no separate award was made for future lost income under the rubric of "losses to decedent," no issue of double recovery is presented.

The problem confronting the Court is the correct response to the jury's error. If the jury had not been discharged, the correct procedure would probably have been to poll them or to submit additional special interrogatories. Fed.R.Civ.P. 49. This Court has considered and rejected holding that this is an inconsistency between the answers to the special interrogatories which allows this Court to harmonize them. Charles Wright & Arthur Miller, *Federal Practice & Procedure* § 2510, at 516–17 (1971) ("Wright & Miller"). The problem is not inconsistency between the answers; the problem is the inconsistency of one answer with the evidence.

This Court could use its discretion to order a new trial. Fed.R.Civ.P. 59. However, that would place a major burden on both the courts and the litigants. In the peculiar facts of this case, this Court concludes that the correct procedure is to correct the erroneous verdict form pursuant to Federal Rules of Civil Procedure 60(a).

> Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders.

Fed.R.Civ.P. 60(a).

██ Juries' errors on verdict forms as to damage amounts can be corrected pursuant to Federal Rules of Civil Procedure

60(a). *See, e.g., United States ex rel. Mississippi Road Supply Co. v. H.R. Morgan, Inc.,* 542 F.2d 262, 269 (5th Cir.1976) (correcting computational error made by jury who "clearly intended to award [Mississippi Road] all of the requested damages" but entered an incorrect larger number), *cert. denied,* 434 U.S. 828, 98 S.Ct. 106, 54 L.Ed.2d 86 (1977); *Woodworkers Tool Works v. Byrne,* 191 F.2d 667, 676 (9th Cir.1951) (transposition of amounts for special and general damages); *Smith v. Philadelphia Transp. Co.,* 173 F.2d 721, 727 (3rd Cir.) (transposition of amounts for wrongful death and survivorship claims, looking at amounts claimed and evidence to decide error occurred), *cert. denied,* 338 U.S. 819, 70 S.Ct. 63, 94 L.Ed. 497 (1949); *Continental Casualty Co. v. Little,* 152 F.2d 728, 729 (5th Cir.1946) (correction of date jury found for beginning of disability in workmen's compensation complaint, jury erroneously entered date before plaintiff claimed to have been injured); *Shaffer v. Great American Indemnity Co.,* 147 F.2d 981, 981–82 (5th Cir.1945) (district court erred in denying judgment on jury finding mentioning "$37.25 approx." when court had evidence allowing it to ascertain the exact figure to substitute); *DC Comics, Inc. v. Filmation Assoc.,* 486 F.Supp. 1273, 1283 (S.D.N.Y.1980) (dicta); *Vizzini v. Ford Motor Co.,* 72 F.R.D. 132, 139 (E.D.Pa.1976) (jury's transposition of two damage figures), *vacated & remanded on other grounds,* 569 F.2d 754 (3rd Cir.1977); Wright & Miller § 2584, at 152–53; *cf. Traylor v. Wachter,* 3 Kan.App.2d 536, 598 P.2d 1061, 1069 (1979) (amending amounts on the verdict form, relying on *inter alia* Wright & Miller), *aff'd in part & rev'd in part on other grounds,* 227 Kan. 221, 607 P.2d 1094 (1980).

Since the jury could only have arrived at the instant figure by accepting plaintiff's argument as to the proper amount for the lost income component of the future economic losses to the survivors, this Court views the placement of "$565,981.85" as a clerical error by the jury. This figure, therefore, will be moved by this Court to the line for "Pecuniary Losses to Survivors: Future (Undiscounted)." The same circumstances show that the jury intended

to award no additional sum for "Lost Income: Past (Prior to Death)." Therefore, the Court will enter "$0.00" on this line of the verdict.

With respect to the discount period, the jury entered "$565,981.85" at a spot on the verdict sheet which did not have a space for the discount period. This makes the answer to that section of the special interrogatory incomplete. Pursuant to Federal Rules of Civil Procedure 49(a), this Court may fill in the resulting blank. Since the jury could only have arrived at this figure by accepting Pearlman's argument, they necessarily intended this figure to represent earnings over the 25.7 years suggested by Pearlman.

For the reasons discussed above, the motions are denied. The parties in *McPadden* are ordered to appear before this Court on August 17, 1992, at 9:30 a.m. for a bench trial to decide if a settlement agreement was made. The judgment against defendant John Crane–Houdaille, Inc. is hereby stayed pending the August 17th bench trial.

The Clerk is directed to mail a copy of the within to counsel for defendants Crane and Keene and to counsel for plaintiffs, who is directed to make appropriate distribution forthwith.

SO ORDERED.